**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS - EASTERN DIVISION**

| | | |
|---|---|---|
| TECHNOLOGY INSURANCE | ) | |
| COMPANY, INC. | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: |
| | ) | |
| v. | ) | |
| | ) | |
| KENNETH D. ALEXANDER, | ) | |
| JERRY R. WILDING, and HOLTKAMP, | ) | |
| LIESE, SCHULTZ & HILLIKER, P.C., | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT**

COMES NOW Plaintiff Technology Insurance Company, Inc. ("TIC"), by and though the undersigned counsel, and for its Complaint against Defendants Kenneth D. Alexander ("Alexander"), Jerry R. Wilding ("Wilding"), and Holtkamp, Liese, Schultz & Hilliker, P.C. (collectively, "Holtkamp Liese"), states as follows:

**Parties and Jurisdiction**

1.     TIC is a New Hampshire insurance company with its principal place of business located in New Hampshire.

2.     Alexander is a Missouri citizen that regularly engages in business as an attorney in the State of Illinois.  Alexander is also an attorney licensed to practice in the States of Illinois and Missouri.  As a licensed Illinois attorney, Anderson has represented Illinois insureds located in Cook County, Illinois, including but not limited to his representation of Omega Demolition Corp. ("Omega"), which is an Illinois company with its principal place of business in Elgin, Illinois.

1

3.     Wilding is a Missouri citizen that regularly engages in business as an attorney in the State of Illinois.  Wilding is also an attorney licensed to practice in the States of Illinois and Missouri.  As a licensed Illinois attorney, Wilding has represented Illinois insureds located in Cook County, Illinois, including but not limited to his representation of Omega.

4.     Holtkamp Liese is a Missouri law firm that regularly engages in business in the State of Illinois.  Holtkamp Liese holds itself out on its website as practicing law "in all federal and state courts in Illinois…"  Wilding and Alexander are attorney-employees of Holtkamp Liese.  On behalf of themselves and Holtkamp Liese, they regularly defend and represent Illinois and Cook County, Illinois clients, such as Omega, in addition to other clients involved in legal actions that are pending in the State of Illinois.

5.     This Court has jurisdiction under 28 U.S.C. §1332(a)(1) because there is complete diversity of citizenship between TIC, on the one hand, and the Defendants, on the other hand, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.     Venue is proper under §1391(b)(2) because a substantial part of the events giving rise to this dispute occurred in the Northern District of Illinois, including but not limited to the legal representation of Omega and TIC by Alexander, Wilding and Holtkamp Liese, as well as the substantial communications and correspondence between Alexander, Wilding and Holtkamp Liese, on the one hand, and Omega and TIC at their respective offices in Cook County, Illinois, on the other hand.

**Factual Allegations Common to All Counts**

7.     Omega obtained a policy of workers' compensation insurance (the "Policy") through the Indiana Assigned Risk Reinsurance Pool (the "Pool"), which exists as a matter of Indiana law, pursuant to Indiana statute.  Ind. Code § 27-7-2-28.1.  The Indiana Compensation

Rating Bureau, an unincorporated association of members, serves as Plan Administrator for the Pool. Ind. Code §§ 27-7-2-3 and 27-7-2-28.1.

8. The Pool contracts with a limited number of its members to act as Pool servicing carriers (each a "Servicing Carrier"). Insurance policies bound by the Pool are assigned to a Servicing Carrier, who then serves as the carrier for the Pool insured. On or after July 29, 2013, the Pool assigned Omega's Policy to TIC for it to administer and service as a Servicing Carrier.

9. In or around January 22, 2014, Rhonda Lenzi, an Omega employee located in Omega's Elgin, Illinois office, contacted TIC at its Chicago, Illinois office and requested that TIC undertake its defense in an action pending in the Circuit Court of the City of St. Louis, in Missouri, captioned, *James McWorthey v. Omega Demolition Corp.*, Cause No.: 1422-CC00253 ("Underlying Lawsuit"). The Underlying Lawsuit asserted a single claim against Omega under 46 U.S.C. § 33, et seq. (the "Jones Act") and General Maritime Law for alleged personal injuries that underlying plaintiff, James D. McWorthey ("McWorthey"), claimed to have sustained while working as an employee of Omega.

10. On January 22, 2014, LaTara Lewis, a TIC employee located in TIC's Chicago, Illinois office, contacted Alexander and Holtkamp Liese to defend and represent TIC and Omega in connection with the Underlying Lawsuit. On that same day, via email and phone, Alexander contacted and communicated with LaTara Lewis in TIC's Chicago, Illinois office, and agreed to that retention on behalf of himself and Holtkamp Liese.

11. Alexander then appointed Wilding to act as the lead attorney for Holtkamp Liese with respect to the aforesaid retention. On January 23, 2014, Wilding sent correspondence to LaTara Lewis in TIC's Chicago, Illinois office, confirming that retention.

12.     In or around the same time, Omega accepted and agreed to the defense and representation provided by Alexander, Wilding and Holtkamp Liese, with the specific intent and understanding that their services would benefit both Omega and TIC, as Omega's insurer.

13.     Upon retaining Holtkamp Liese and through at least August 2015, an ongoing, continuous and direct attorney/client relationship existed between Holtkamp Liese, on the one hand, and TIC and Omega, on the other hand, in connection with the Underlying Lawsuit. During that same time period, an insurer/insured/retained counsel tripartite relationship also existed between Holtkamp Liese, on the one hand, and TIC and Omega, on the other hand, which placed Holtkamp Liese in a fiduciary relationship with TIC and Omega.

14.     In part, that relationship was initially formed and continued as a result of Holtkamp Liese holding itself out in its advertising, on the internet and otherwise, as being specialized in the areas of "Workers' Compensation in Missouri and Illinois," "Insurance Defense," "Construction Law," and "Transportation Law," and championed the firm's ability to "Take Litigation to a Higher Level."

15.     In that regard, TIC needed a law firm that could represent its own interests and the interests of its insureds in legal matters pending in both Missouri and Illinois.  Alexander and Holtkamp Liese held themselves out as having that specific experience and in reliance on their representations and advertising efforts, which reached out to the State of Illinois, both TIC and Alexander/Holtkamp Liese agreed to form an ongoing, continuing and direct attorney/client relationship that would extend to TIC and its insureds with respect to various legal matters, including the Underlying Lawsuit.

16.     In fact, Alexander and Holtkamp Liese agreed to their retention as attorneys-in-fact with respect to the Underlying Lawsuit, as well as hundreds of other legal matters both

before and after January 2014 involving TIC and its insureds in Missouri and Illinois, along with all of the duties and obligations attendant to the formation and ongoing existence of an attorney/client relationship, and as well, a tripartite relationship.

17.     That ongoing, continuous and direct attorney/client relationship during that entire time period is evidenced, in part, by correspondence and communications between Holtkamp Liese and TIC addressing attorney/client and work product privileged issues, as well as, attorney invoices submitted to, and paid by, TIC for legal defense/representation work undertaken by Anderson, Wilding and Holtkamp Liese on behalf of TIC and Omega.

18.     During the pendency of the Underlying Lawsuit, Alexander, Wilding and Holtkamp Liese regularly reached out to, and communicated with, Omega and TIC in their respective Illinois' offices through emails, written correspondence and phone calls. [*See* Holtkamp Liese Emails/Communications, attached hereto as Exhibit 1]. These efforts were all undertaken by Alexander, Wilding and Holtkamp Liese to represent and protect the interests of Omega and TIC in connection with the Underlying Lawsuit, and included Wilding/Holtkamp Liese traveling to Cook County, Illinois to meet with employees/representatives of Omega and to present them for their depositions in Cook County, Illinois. [*See* Depo Trans. Excerpts, attached hereto as Exhibit 2].

19.     In fact, from at least January 2013 through August 2015, Anderson, Wilding and Holtkamp Liese regularly reached out to and communicated with TIC at its Chicago, Illinois office, with respect to legal matters involving their representation of TIC and its insureds, including but not limited to the Underlying Lawsuit. These substantial communications between Holtkamp Liese and TIC at its Chicago, Illinois office were a direct result of the fact that TIC was one of the firm's largest clients.

20.     Some of the TIC employees that Holtkamp Liese communicated with in relation to the Underlying Lawsuit were LaTara Lewis, Jeffrey Mazich and Elly O'Donnell.  All three of these individuals lived and worked in Cook County, Illinois at the time that these communications occurred.  [*See* Depo Trans. Excerpts and Affidavit, attached hereto as Exhibit 3].

21.     Unbeknownst to TIC, however, despite their agreement to represent TIC and Omega with respect to the Underlying Lawsuit, Anderson, Wilding and Holtkamp Liese were not qualified to defend a claim under the Jones Act.  In fact, after defending and representing their interests for more than one year, facts came to light which showed that:

A. They lacked any substantive knowledge with respect to the Jones Act.   In Wilding's own words, Holtkamp Liese was "not a big player in handling Jones Act cases."

B. They lacked any prosecution or defense experience with respect to Jones Act claims.  In Wilding's own words, he "never tried a Jones Act case."

C. They lacked any experience or knowledge relative to the requirements for an individual to qualify as a "seaman" under the Jones Act, or any other defenses to a Jones Act claim, in addition to the actions they needed to take to identify and collect evidence to support a defense based on lack of "seaman" status.

22.     Anderson, Wilding and Holtkamp Liese failed to disclose each of the facts set forth in Paragraph 21 and, in fact, led TIC and Omega to believe that they had the necessary knowledge, expertise and experience to defend a Jones Act claim.  Absent such disclosure, neither TIC nor Omega knew, or had any reason to believe, that Anderson, Wilding and Holtkamp Liese were not qualified to defend the Underlying Lawsuit.  Furthermore, based on their failure to make any such disclosure and their decision to hold themselves out as having the

necessary knowledge, expertise and experience to defend a Jones Act claim, TIC and Omega were completely unaware that they needed to obtain new counsel to protect their interests in the Underlying Lawsuit.

23.     As a result of their lack of knowledge, expertise and experience with respect to defending a Jones Act claim, Anderson, Wilding and Holtkamp Liese completely failed to take the necessary steps to educate and familiarize themselves about the law and the facts implicated by the Jones Act claim that they were defending in the Underlying Lawsuit.  Had they made such efforts, they could have acted to protect the interests of TIC and Omega in the Underlying Lawsuit.  Instead, however, they failed to take the actions which were necessary to protect those interests, including but not limited to, filing a summary judgment motion – to secure the dismissal of McWorthey's Jones Act claim against Omega, even though Wilding/Holtkamp Liese had evidence in their possession which conclusively established that McWorthey did not qualify as a "seaman" under the Jones Act.

24.     Anderson, Wilding and Holtkamp Liese also failed to take McWorthey's deposition during the pendency of the Underlying Lawsuit and intentionally withheld that information from TIC, despite repeated requests from TIC that Wilding confirm that he would take or had taken this deposition.

25.     In addition, during the pendency of the Underlying Lawsuit, even though Anderson, Wilding and Holtkamp Liese continued to represent TIC in connection with the Underlying Lawsuit and other litigation pursuant to an attorney/client relationship, they failed to advise TIC that they had become involved in an improper and unethical scheme to assist McWorthey – their opponent and adversary in the Underlying Lawsuit – with obtaining a "lay

down judgment" against Omega, which could be used in a garnishment action against TIC. Evidence of their involvement in that scheme, includes *inter alia*:

A. On December 30, 2014, Wilding sent correspondence to Omega's owner, Charles Gerage ("Gerage"), who at all times was located within and communicated from Cook County, Illinois, and Omega's personal counsel, Anthony Sciara ("Sciara"), which confirmed that: "This morning, the attorneys representing Mr. McWorthey appeared at my office for an informal conversation regarding the case in general, written discovery and depositions in particular. They are concerned that Omega may not have insurance coverage for their Jones Act claim."

B. On February 3, 2015, Wilding sent correspondence to Gerage, who was located within and communicated from Cook County, Illinois, which confirmed that: "This afternoon, Mr. McWorthey's attorneys showed up again at my office to discuss the case. . . . They did mention the possibility of entering into an agreement (the terms of which are governed by Missouri statute) with Omega where we roll over and let them take a judgment against Omega, and they agree not to collect anything against Omega, but to pursue only against Omega's insurance carriers, if coverage is found to exist."

C. On February 24, 2015, Wilding sent correspondence to Gerage, who was located within and communicated from Cook County, Illinois, which confirmed that: "When Jerry Schneller called this morning, I raised the issue of Omega confessing judgment. He said it is a possibility but he wants to see McBride's insurance policy before agreeing to it."

D. On March 23, 2015, Sciara sent correspondence to Wilding and Gerage, who was located within and communicated from Cook County, Illinois, which stated that: "I just received a call from Chris Finney. . . . He said that they do not want to get a judgment against Omega; that

they want insurance coverage; but that it seems Omega is unwilling to cooperate and 'wants' that to happen."

E. On July 9, 2015, Sciara sent correspondence to Omega's other personal counsel, John Farmer, Wilding, and Gerage (who was located within and communicated from Cook County, Illinois), which stated that: "They [Mssrs. Finney and Schneller] want to move forward with the consent judgment. Here was the specific proposal: Omega pays $5,000.00 to McWorthey. Omega essentially agrees to admit liability and not contest damages. McWorthey puts on evidence of his damages at a hearing with the judge. The judge makes a finding and enters a judgment (Jerry Wilding would attend court for this). McWorthey agrees not to collect the judgment from *any* of Omega's assets, aside from the claims we assign McWorthey against the insurance companies, broker, ICRB, AED, McBride (and their insurers), and any other claims against others that may exist. . . . They are hoping to get into court to do this by the 20th or 27th, of this month; they want to move quickly (*I believe they are concerned about TIC requesting to take over the defense and admit liability; something I left them with the impression may happen recently*). Chuck has stated his desire to move forward with this. I will contact Gerry/Chris to let them know. He asked that I take the lead in working with them to finalize an agreement. Chris/Gerry—and Chuck agreed—also ask that I not inform our coverage opponents counsel of this. I will remain quiet. Everyone else please do so too."

F. On July 9, 2015, Sciara sent correspondence to Wilding, which advised that: "I'm sure we can—even at the last minute—dismiss and moot McBride's motion, and transfer that into the lay down judgment day. I will reach out to Finney/Schneller and let them know 27th is better. Well played with Morris [Imperium counsel]. Technically, the mediation is still on the

calendar. I actually think Plaintiffs are hoping to get this done, and then still go to mediation with these people and attempt to settle their judgment. Not a bad strategy on their part."

26.     Anderson, Wilding and Holtkamp Liese failed to disclose each of the facts set forth in Paragraph 25, and thereby deprived TIC of material facts which it was entitled to know since they were continuing to represent the interests of TIC in connection with the Underlying Lawsuit and other litigation pursuant to an attorney/client relationship, even though they were laboring under a direct conflict of interest that they had also failed to disclose.

27.     In fact, Wilding/Holtkamp Liese, Sciara and Gerage (who was located within and communicated from Cook County, Illinois) all agreed to engage in the afore-referenced improper and collusive scheme with McWorthey and his counsel. As part of that scheme, in July 2015, they all agreed to withhold the true facts regarding what was occurring from TIC and its counsel (who at all times was located in Cook County, Illinois), and to mislead them into believing that Omega was attending a mediation on August 12, 2015 in the Underlying Lawsuit and that TIC would be given an opportunity to resolve the case prior to a trial occurring or Omega taking any other action, when in fact Omega had agreed to a settlement involving a sham "trial" and a "lay down judgment that McWorthey could use to enforce against TIC, Imperium and others.

28.     To that end, without any notice to TIC and despite prior representations that a trial would not occur until *after* an August 12, 2015 mediation so TIC would be given an opportunity to resolve the Underlying Lawsuit, Omega secretly agreed in early July 2015 to enter into a settlement with McWorthey, subject to the following terms: in exchange for a payment of $5,000.00 and an assignment of rights, Omega would attend a sham "trial" in the Underlying Lawsuit that would occur *prior to* the August 12, 2015 mediation so McWorthey could obtain an

excess judgment that he could enforce against TIC and others in a garnishment action (the "Agreement"). [*See* Agreement, attached hereto as Exhibit 4].

29.     In July 2015, Omega (by and through Gerage, who was located within Cook County, Illinois), Sciara and Wilding/Holtkamp Liese withheld from TIC their involvement in the negotiations, approval and execution of the Agreement, even though it listed TIC as an asset for collection of any judgment.

30.     Wilding/Holtkamp Liese also concealed from TIC the fact that they had agreed to comply with the explicit order from Omega (by and through Gerage, who was located within Cook County, Illinois) and Sciara that Wilding should attend the July 24, 2015 sham "trial" and allow McWorthey to obtain a judgment against Omega in whatever amount he sought fit to request, even though they knew that McWorthey's counsel would have a judgment entered in an amount that was grossly disproportionate to his actual damages, if any.

31.     That same month, Omega (by and through Gerage, who was located within and directed all actions of his company from Cook County, Illinois), Sciara and Wilding/Holtkamp Liese also intentionally misled TIC into believing that Omega still intended to act consistent with its counsel's prior representations that it was attending the August 12, 2015 mediation prior to a trial or any other action occurring in the Underlying Lawsuit. Amongst other things, they emailed TIC's counsel (who was located in Chicago, Illinois) a written case evaluation report in response to his formal request for such a report, at the exact same time that they were negotiating the afore-referenced settlement/sham "trial"/"lay down judgment." Omega, Sciara and Wilding/Holtkamp Liese prepared the report and sent it to TIC's counsel in Chicago, Illinois with the full knowledge and understanding that TIC wanted the evaluation so it could prepare for and participate in the mediation.

32.     In furtherance of the above-referenced scheme, Omega (by and through Gerage, who was located within and directed all actions of his company from Cook County, Illinois) and Wilding/Holtkamp Liese also concealed the following from TIC:

A.  Their involvement in the entry of a July 27, 2015 judgment (the "Judgment") in the Underlying Lawsuit against Omega and in favor of McWorthey in the sum of Thirty-Five Million Dollars ($35,000,000.00), premised solely upon alleged liability under the Jones Act, and despite substantial evidence which established that his injuries had fully resolved, including but not limited to: post-accident surveillance video, which reflected that McWorthey drove himself on a daily basis, visited businesses and restaurants independently, met and spent time with friends and acquaintances, visited and gambled at casinos, communicated on his cellular phone, lifted objects, bent over, and loaded heavy items without issue.  [*See* Judgment, attached hereto as Exhibit 5].

B.  Their involvement in moving the "trial" date in the Underlying Lawsuit from August 12, 2015 to March 28, 2016, and then only days later, moving it again to July 24, 2015 to hide the fact that it was occurring from TIC and Omega's other insurers.

C.  Their involvement in moving the Underlying Lawsuit from the City of St. Louis civil docket to the criminal docket so the "trial" would not occur in front of the presiding judge, but instead, before a criminal judge (Judge Mullen) that had no prior involvement or experience with the case, which Wilding/Holkamp Liese knew would add a layer of secrecy to the "trial" to prevent TIC or anyone else from discovering what was really occurring.

D.  Their involvement in utilizing a third judge (Judge Moriarty) who had no prior involvement or experience with the case to obtain the dismissal of the parties that were actually

liable for McWorthey's alleged injuries, as yet another layer of secrecy to prevent TIC or anyone else from discovering what was really occurring.

E. Their involvement in the intentional and knowing waiver of all of Omega's defenses to McWorthey's Jones Act claim, his purported injuries and damages, and the pre-trial dismissal of the actual defendants who were responsible for the injuries alleged by McWorthey, *to wit*, McBride River Services, LLC and Advanced Explosive Demolition, Inc.

F. Their involvement in a July 24, 2015 "trial," wherein Wilding/Holtkamp Liese committed the following additional negligent acts and omissions:

      i.    They did not call McWorthey to testify as a witness despite his status as the plaintiff and, as a result, they did not question him on the facts and circumstances relating to: the purported accident, whether he qualified as a "seaman" under the Jones Act, his alleged personal injuries, and his purported damages. McWorthey's non-appearance and failure to testify was the result of his attorneys' litigation strategy and the decision by Wilding/Holtkamp Liese not to summon him for such testimony, despite their actual knowledge that he would seek entry of a judgment well in excess of the Policy and likely consistent with his assertion that his claim was worth $20 million. In turn, McWorthey's non-appearance precluded the judge in the Underlying Lawsuit from personally observing McWorthey, assessing his credibility, and ascertaining whether the damages sought were commensurate with those observations and McWorthey's own testimony. Wilding/Holtkamp Liese thereby assisted with the concealment of McWorthey's actual physical and mental condition to prevent the underlying court from assessing his actual damages, if any.

      ii.    They did not do any of the following: introduce any evidence, cross-examine any witnesses, present any witnesses of their own, object to the admission of any

evidence by McWorthey, or make an opening or closing statement. Instead, Wilding/Holtkamp attended the "trial" and did absolutely nothing to defend the interests of TIC and Omega. In so doing, they recklessly committed negligence by failing to assert any objections or challenges or to dispute in any manner:

        a) McWorthey's social, physical, mental, biological, and chemical condition, both pre and post-accident, and whether any issues were pre-existent or were caused by the accident.

        b) Whether McWorthey qualified as a "seaman" under the Jones Act and had standing to assert and seek relief on such a claim.

        c) Whether a legal basis existed to apply Missouri substantive law (§ 537.065 RSMo) with respect to a case involving a single federal claim under the Jones Act and included no causes of action sounding in Missouri law.

        d) The foundation for any of McWorthey's purported evidence.

        e) The competence and credibility of Denise Hampton, who was identified alternatively during the trial (by both McWorthey's counsel and Ms. Hampton) as "kind of essentially McWorthey's common law spouse" (a status which is explicitly proscribed by Missouri statute, pursuant to § 451.040.5 RSMo), McWorthey's "girlfriend," and McWorthey's "ex-girlfriend."

        f) The qualifications, competence and credibility of McWorthey's experts to render opinions and the legal and factual basis for those opinions; and

        g) The calculation of damages (the only figures cited in the transcript of the "trial" are an unauthenticated $9,500,000.00 life care plan and unauthenticated estimate of $1,600,000.00 in future wage loss. The $23,900,000.00 in additional damages set forth in the

Judgment is not accounted for in the record). In fact, Wilding/Holtkamp Liese had actual knowledge of the unreasonableness of the amount in purported damages requested by McWorthey ($35,000,000.00), which is evidenced by the afore-referenced December 16, 2014 correspondence concerning McWorthey's self-sufficiency and physical and mental abilities, and a November 26, 2014 email between Wilding and Gerage concerning the *de minimis* amount of workers' compensation benefits and medical expenses incurred by McWorthey. Notwithstanding this actual knowledge, Wilding/Holtkamp Liese failed to object to, *inter alia*, the following unsubstantiated statements by McWorthey's counsel during the "trial": "Judge, he's out of his mind. He is unaware of his surroundings. Though he looks fine and can walk and talk, his behaviors are sociopathic. He has homicidal ideations. He has occasional suicidal ideations. He has a constant migraine which has been consistent for two years. He has been close to two hundred doctor appointments, including therapists, neuropsychologists, radiologists, orthopedic surgeons. The man has been treating consistently since July 24th when he went to the emergency room up through today. . . . And for these damages, Judge, for everything that has happened to him and that will happen to him that his life has been completely altered we believe it warrants a judgment of 35 million dollars to account for everything that Mr. McWorthey has dealt with, to protect the public and to protect himself. Because if he doesn't get the money he needs, he's going to be out on the street. He has homicidal ideations. He has suicidal ideations. He is aggressive to woman [sic]. God forbid he gets out, rapes someone, kills someone and does something that he has no idea what he is doing. And that money would be there to protect him and protect everyone else." During his 2016 deposition, McWorthey contested the accuracy of these very statements. Further, following several months of ongoing video surveillance,

McWorthey shows no sign of injury or impairment that reasonably corresponds to the damages claimed in the Underlying Lawsuit or the amount of the Judgment.

## COUNT I: BREACH OF FIDUCIARY DUTY

33.     TIC incorporates by reference Paragraphs 1-32 as if fully set forth herein.

34.     Based on the attorney/client relationship between TIC, on the one hand, and Anderson, Wilding and Holtkamp Liese, on the other hand, and pursuant to their tripartite relationship, Anderson, Wilding and Holtkamp Liese owed TIC fiduciary duties, including but not limited to, the duty of loyalty, the duty to avoid conflicts of interest, the duty to communicate, and the duty of candor.

35.     At a minimum, Anderson, Wilding and Holtkamp Liese were under a strict ethical obligation under Illinois and Missouri law and pursuant to the Rules of Professional Conduct not to engage in any the following improper conduct:

a.   Participate in conduct that is criminal or fraudulent or participating in a sham transaction.

b.   Represent a client when a concurrent conflict of interest exists.  "A concurrent conflict of interest exists if: (1) the representation of one client will be directly adverse to the representation of another client; or (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer."

c.   Withhold "information to serve the lawyer's own interest or convenience or the interests or convenience of another person."

d.   Fail to keep "a client reasonably informed about the status of a matter," such as "significant developments affecting the timing or the substance of the representation."

16

e. Fail to "disclose a material fact when disclosure is necessary to avoid assisting a . . . fraudulent act by a client."

f. Misrepresent information. "A misrepresentation can occur if the lawyer incorporates or affirms a statement of another person that the lawyer knows is false. Misrepresentations can also occur by partially true but misleading statements or omissions that are the equivalent of affirmative false statements."

36. Anderson, Wilding and Holtkamp Liese breached their fiduciary duties to TIC by *inter alia*:

A. Concurrently representing multiple clients, including Omega and TIC, despite the existence of a direct conflict of interest between them and, in fact, counseling and assisting one client with efforts to set-up and establish liability against the other client, even though those efforts involved withholding and misrepresenting information, engaging in improper and unethical conduct, and using the firm's unique position and knowledge gained through privileged communications to accomplish those efforts.

B. Failing to disclose and resolve the afore-referenced conflict of interest by immediately (when the conflict first arose) withdrawing from the representation of both parties after full and complete disclosure of the conflict and what was occurring.

C. Failing to disclose their lack of knowledge, expertise and experience to defend a Jones Act case and, in fact, leading TIC and Omega to believe that they were competent to handle the Underlying Lawsuit.

D. Failing to educate and familiarize themselves with the law and the facts implicated by McWorthey's Jones Act claim in the Underlying Lawsuit, and to take all necessary actions to fully protect the interests of TIC and Omega with respect to that claim, including but

17

not limited to, filing a summary judgment motion to secure the dismissal of the Underlying Lawsuit since McWorthey did not qualify as a "seaman."

E. Failing to disclose their actual knowledge of evidence which showed that McWorthey's injury and damage claim was *de minimus* at best, if at all.

F. Failing to disclose the facts and circumstances surrounding the Agreement, the July 24, 2015 "trial," the surreptitiously rescheduled court dates and judge reassignments, the "law down judgment," and all related negotiations, including but not limited to the disclosure of communications with McWorthey's attorneys and others concerning the Agreement and the "lay-down judgment" when Wilding/Holtkamp Liese they knew that McWorthey's attorneys contemplated "Omega rolling over" and permitting McWorthey to "take a judgment against Omega, and they agree not to collect anything against Omega, but to pursue only against Omega's insurance carriers [e.g., TIC]."

G. Actively participating in a scheme that involved Wilding/Holtkamp Liese counseling and participating in McWorthey and Omega's combined and collusive efforts to set-up and establish liability on the part of TIC for the "lay down judgment," even though those efforts involved withholding and misrepresenting information, engaging in improper and unethical conduct, and using the firm's unique position and knowledge gained through privileged communications to accomplish those efforts.

H. Actively participating in the preparation and execution of the Agreement and permitting TIC to be expressly identified in the Agreement as a source of collection for the "lay down judgment," without TIC's knowledge.

I. Failing to disclose and actively concealing the fact that Omega had secretly agreed to execute the Agreement and attend a "trial" in the Underlying Lawsuit on July 24, 2015,

in lieu of a mediation in August 2015, despite repeated representations that a trial would not occur until *after* the afore-referenced mediation and TIC was given a chance to resolve the Underlying Lawsuit.

J.   Intentionally and knowingly waiving Omega's defenses to McWorthey's claims at "trial," even though Omega could have obtained a complete dismissal of the Underlying Lawsuit based on those claims and could have successfully rebutted his contention that a legal and factual basis existed for a damage award of $35 million.

K. Failing to take any action to defend the interests of Omega and TIC at the unscheduled, two-hour "trial" preceding entry of the "lay-down judgment," including but not limited to:

    i.    Not introducing any evidence.

    ii.    Not cross-examining any witnesses.

    iii.    Not challenging the qualifications of any alleged expert witness or their opinions.

    iv.    Not presenting any witnesses of their own, including expert witnesses.

    v.    Not making any objections to the introduction of evidence or for any other reason.

    vi.    Not making an opening or closing statement.

    vii.    Not challenging, disputing or objecting to the legal and factual bases asserted by McWorthey and his counsel that he qualified as a "seaman" under the Jones Act.

      viii.    Not challenging, disputing or objecting to representations, statements and arguments made by McWorthey's counsel that a legal and factual basis existed for him to recover $35 million in damages.

37.    As a direct and proximate result of the afore-referenced acts and omissions, the following occurred: a $35 million judgment was entered in the Underlying Lawsuit; TIC has been forced to expend a substantial amount of attorneys' fees, costs and expenses to defend and protect itself against McWorthey's efforts to collect the judgment and, as well, to protect its other business interests that have been directly affected by the actions of Holtkamp Liese and the existence of the Judgment. TIC's damages also extend to the amounts it paid Holtkamp Liese in connection with the Underlying Lawsuit.

38.    It was entirely foreseeable by Alexander, Wilding and Holtkamp Liese that their negligent conduct would result in direct and appreciable harm to TIC since TIC was Omega's insurer and could ultimately be liable for any judgment that resulted from their negligence or their intentional conduct and, in fact, they participated in efforts with the understanding that their actions would result in such harm.

39.    But for the acts and omissions on the part of Alexander, Wilding and Holtkamp Liese, TIC would not have suffered the above-referenced damages.

40.    The conduct of Alexander, Wilding and Holtkamp Liese was outrageous and dishonest, and was undertaken with reckless indifference to TIC, justifying the imposition of punitive damages against them.

## COUNT II: LEGAL MALPRACTICE

41.     TIC incorporates by reference Paragraphs 1-32 as if fully set forth herein.

42.     At all relevant times alleged herein, an ongoing, continuous and direct attorney/client relationship existed between TIC, on the one hand, and Anderson, Wilding and Holtkamp Liese, on the other hand.  During that same time period, an insurer/insured/retained counsel tripartite relationship also existed between Holtkamp Liese, on the one hand, and TIC and Omega, on the other hand.

43.     Anderson, Wilding and Holtkamp Liese owed TIC a duty of due care pursuant to those relationships with respect to their handling and defense of the Underlying Lawsuit and their representation of TIC's interests in relation thereto.  That duty included but was not limited to, exercising the same reasonable degree of care, skill, prudence, diligence, and judgment as attorneys of ordinary skill and capacity under the same or similar circumstances would have exercised.

44.     However, Anderson, Wilding and Holtkamp Liese breached their duties to TIC failed to use such skill, prudence, diligence, and judgment as attorneys of ordinary skill and capacity under the same or similar circumstances would have exercised with respect to their handling and defense of the Underlying Lawsuit and their representation of TIC's interests in relation thereto, as evidenced by, *inter alia*, the following acts and omissions by Defendants:

        A.  Failing to disclose their lack of knowledge, expertise and experience to defend a Jones Act case and, in fact, leading TIC and Omega to believe that they were competent to handle the Underlying Lawsuit.

        B.  Failing to educate and familiarize themselves with the law and the facts implicated by McWorthey's Jones Act claim in the Underlying Lawsuit, and to take all necessary

actions to fully protect the interests of TIC and Omega with respect to that claim, including but not limited to, filing a summary judgment motion to secure the dismissal of the Underlying Lawsuit since McWorthey did not qualify as a "seaman."

C. Failing to disclose their actual knowledge of evidence which showed that McWorthey's injury and damage claim was *de minimus* at best, if at all.

D. Failing to disclose the facts and circumstances surrounding the Agreement, the July 24, 2015 "trial," the surreptitiously rescheduled court dates and judge reassignments, the "law down judgment," and all related negotiations, including but not limited to the disclosure of communications with McWorthey's attorneys and others concerning the Agreement and the "lay-down judgment" when Wilding/Holtkamp Liese they knew that McWorthey's attorneys contemplated "Omega rolling over" and permitting McWorthey to "take a judgment against Omega, and they agree not to collect anything against Omega, but to pursue only against Omega's insurance carriers [e.g., TIC]."

E. Actively participating in a scheme that involved Wilding/Holtkamp Liese counseling and participating in McWorthey and Omega's combined and collusive efforts to set-up and establish liability on the part of TIC for the "lay down judgment," even though those efforts involved withholding and misrepresenting information, engaging in improper and unethical conduct, and using the firm's unique position and knowledge gained through privileged communications to accomplish those efforts.

F. Actively participating in the preparation and execution of the Agreement and permitting TIC to be expressly identified in the Agreement as a source of collection for the "lay down judgment," without TIC's knowledge.

G. Failing to disclose and actively concealing the fact that Omega had secretly agreed to execute the Agreement and attend a "trial" in the Underlying Lawsuit on July 24, 2015, in lieu of a mediation in August 2015, despite repeated representations that a trial would not occur until *after* the afore-referenced mediation and TIC was given a chance to resolve the Underlying Lawsuit.

H. Intentionally and knowingly waiving Omega's defenses to McWorthey's claims at "trial," even though Omega could have obtained a complete dismissal of the Underlying Lawsuit based on those claims and could have successfully rebutted his contention that a legal and factual basis existed for a damage award of $35 million.

I. Failing to take any action to defend the interests of Omega and TIC at the unscheduled, two-hour "trial" preceding entry of the "lay-down judgment," including but not limited to:

  i. Not introducing any evidence.

  ii. Not cross-examining any witnesses.

  iii. Not challenging the qualifications of any alleged expert witness or their opinions.

  iv. Not presenting any witnesses of their own, including expert witnesses.

  v. Not making any objections to the introduction of evidence or for any other reason.

  vi. Not making an opening or closing statement.

  vii. Not challenging, disputing or objecting to the legal and factual bases asserted by McWorthey and his counsel that he qualified as a "seaman" under the Jones Act.

viii.    Not challenging, disputing or objecting to representations, statements and arguments made by McWorthey's counsel that a legal and factual basis existed for him to recover $35 million in damages.

45.    As a direct and proximate result of the afore-referenced acts and omissions, the following occurred: a $35 million judgment was entered in the Underlying Lawsuit; TIC has been forced to expend a substantial amount of attorneys' fees, costs and expenses to defend and protect itself against McWorthey's efforts to collect the judgment and, as well, to protect its other business interests that have been directly affected by the actions of Holtkamp Liese and the existence of the Judgment.  TIC's damages also extend to the amounts it paid Holtkamp Liese in connection with the Underlying Lawsuit.

46.    It was entirely foreseeable by Alexander, Wilding and Holtkamp Liese that their negligent conduct would result in direct and appreciable harm to TIC since TIC was Omega's insurer and could ultimately be liable for any judgment that resulted from their negligence or their intentional conduct and, in fact, they participated in efforts with the understanding that their actions would result in such harm.

47.    But for the acts and omissions on the part of Alexander, Wilding and Holtkamp Liese, TIC would not have suffered the above-referenced damages.

48.    The conduct of Alexander, Wilding and Holtkamp Liese was outrageous and dishonest, and was undertaken with reckless indifference to TIC, justifying the imposition of punitive damages against them.

### **Request for Jury Trial**

TIC requests a trial by jury on all issues and claims set forth herein.

**<u>Prayer for Relief</u>**

WHEREFORE, Plaintiff TIC respectfully requests that this Court enter judgment in its favor and against Defendants Anderson, Wilding and Holtkamp Liese for TIC's economic, consequential and all other damages as alleged herein and/or based on the evidence at trial, as well as punitive damages, prejudgment interest, attorney's fees, costs, and expenses, and such other and further relief that this Court deems proper under the circumstances.

/s/ Kevin M. Lougachi
Kevin M. Lougachi
Karbal, Cohen, Economou, Silk & Dunne, LLC
150 South Wacker Drive, Suite 1700
Chicago, Illinois 60606
Tel: 312.431.3700
Fax: 312.431.3670
klougachi@karballaw.com
*Attorneys for Plaintiff Technology Insurance Company, Inc.*